An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-566

Filed 20 May 2026

Durham County, No. 24JT001105-310

IN THE MATTER OF: R.M.

Appeal by respondent-mother from order entered 27 February 2025 by Judge Nancy Gordon in Durham County District Court. Heard in the Court of Appeals 21 April 2026.

*Mercedes O. Chut, for respondent-appellant mother.*

*No Brief for petitioner-appellee Durham County Department of Social Services.*

*Maynard Nexsen PC, by Kevin Y. Zhao, for guardian ad litem.*

WOOD, Judge.

Respondent-Mother ("Mother") appeals from the trial court's order terminating parental rights to her minor son R.M. ("Robby").[1] Mother argues the trial court erred because (1) the trial court abused its discretion in failing to conduct an inquiry about Mother's need for a Rule 17 guardian *ad litem* and (2) the evidence did not support termination of parental rights under N.C. Gen. Stat. § 7B-1111(a)(1), (2) or (7). After careful review, we affirm the trial court's termination of Mother's parental rights.

## I.   Factual and Procedural Background

Mother has significant history with the Durham County Department of Social Services ("DSS"). Her parental rights to four previous children were terminated before Robby came into DSS custody.

On 18 November 2022, DSS received a report that Robby, a five-year old non-verbal child with special needs, had arrived at daycare with black eyes and scratches on his face and neck. The daycare was concerned about possible domestic violence and abuse.

DSS initiated an investigation; however, Mother was resistant and would not allow DSS to see or speak to Robby. Mother expressed she was not concerned about Robby's injuries, could not explain how the injuries happened, did not seek medical

---

[1] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

attention for his injuries, and was dismissive of DSS' concerns that Stepfather may have caused the injuries.

On 23 November 2022, the district court issued an Ex Parte Order to Cease Obstruction of or Interference with Juvenile Assessment. At some point thereafter, Mother allowed DSS access to the home and Robby was evaluated by the Duke Child Abuse and Neglect Medical Evaluation Clinic ("CANMEC") who found his injuries were consistent with abuse. Mother agreed to a safety placement outside of the home with Robby's Step-Grandfather. However, on 11 January 2023, due to his own health concerns the safety provider returned Robby to Mother's care. Mother did not notify DSS of the placement change, a violation of the safety plan.

On 11 January 2023, DSS filed a petition for nonsecure custody based on the grounds of abuse, neglect, and dependency. DSS noted Mother's previous terminations of parental rights and Stepfather's admitted mental health concerns and prior conviction for sexual battery. Additionally, DSS stated that not only had Mother failed to seek emergency medical care for Robby when he had been injured, she also had failed to provide necessary medical care for his ongoing conditions. Robby has serious developmental delays and had been referred previously to a neurologist due to concerns with macrocephaly. Mother did not take him to any of the appointments. The same day, the trial court granted DSS' petition for nonsecure custody and entered an order for nonsecure custody.

Following a hearing on 24 January 2023, the trial court ordered that a guardian *ad litem* ("GAL") be appointed for Mother due to a "long history of mental health issues and cognitive issues, that may impede her ability to comprehend matters before the court." The trial court found, "Mother consistently repeated she is not guilty despite being told that is not the standard in this courtroom, walked out of the hearing several times upset, and required constant redirection by the court."

On 18 May and 11 September 2023, the trial court held the adjudication hearing and found Robby to be abused, neglected, and dependent. The disposition hearing was scheduled for 11 October 2023; however, no record of that hearing is included in the appellate record on review. The record does include an order for continuance filed 8 December 2023 and two continuance orders that were filed 19 March 2024. The second and third orders note that the disposition order following the adjudication had not been filed and Mother could not be located. Another hearing was scheduled for 12 April 2024.

On 12 April 2024, the trial court conducted a permanency planning hearing. Robby had been in the custody of DSS for over fifteen months, and Mother still could not be located. Mother had (1) not attended any visitation, (2) not responded to letters or phone calls, (3) had blocked the DSS social worker from contacting her phone, and (4) no longer resided at her last known address. DSS made attempts to locate Mother through various online searches but was unsuccessful in locating her. Neither Mother's attorney nor her GAL had any contact with Mother. The trial court ceased

- 4 -

reunification efforts and removed reunification as a permanent plan. The trial court ordered Robby's permanent plan to be adoption with guardianship as the secondary plan. In the event Mother still desired to work towards reunification, the trial court ordered Mother to: (1) submit to a comprehensive Parenting Capacity Assessment; (2) learn information regarding the child's current developmental status; (3) demonstrate a willingness and ability to address the developmental needs of the child; and (4) consistently attend and engage in the necessary identified appointments for the child. Additionally, the trial court ordered Mother and Stepfather to provide DSS with their current information as well as the contact information or records from all service providers.

On 16 September 2024, DSS filed a petition to terminate Mother's parental rights. DSS alleged grounds for termination of parental rights were neglect pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), willfully leaving the children in care for more than twelve months without demonstrating reasonable progress in correcting the conditions that led to the removal pursuant to subsection (a)(2), dependency pursuant to subsection (a)(6), and previous termination of parental rights to another child and lack of willingness or ability to establish a safe home pursuant to subsection (a)(9).

On 19 September 2024, the trial court allowed another continuance to provide DSS with additional time to establish contact with Mother and to appoint new counsel for Mother after her previous counsel had withdrawn due to lack of contact. On 4 October 2024, the matter was continued again to allow DSS additional time to contact

Mother. On 1 November, the matter was continued because a conflict had arisen requiring Mother's new counsel to withdraw. On 4 November 2024, the matter was continued because DSS had been unable to serve Mother and Unknown Father.

On 8 November 2024, the trial court held a hearing to determine if service by publication was appropriate and determined that it was. The trial court ordered service be perfected by publication. However, the written order was not signed and filed until 7 January 2025.

On 14 January 2025, the trial court held a termination of parental rights hearing. Mother was represented by an attorney but did not have a GAL. Mother participated in the hearing by phone and testified on her own behalf. Mother testified that after her last "in person" court date for Robby on or about 24 January 2023, she moved to Weston, Florida and cut off all contact with DSS and Robby. DSS introduced testimony from Ronald Coker, the DSS social worker assigned to Robby's case. Additionally, the trial court took judicial notice of the adjudication order in the underlying file and noted Mother's parental rights to her four older children had been terminated previously.

On 27 February 2025, the trial court filed its order terminating Mother's parental rights to Robby based on a reasonable likelihood of future neglect, willfully leaving the child in foster care for more than twelve months without demonstrating reasonable progress in correcting the conditions that led to the removal, and abandonment. Mother gave timely written notice of appeal on 17 March 2025.

## II.    Analysis

On appeal Mother contends the trial court erred because (1) the trial court abused its discretion by failing to conduct an inquiry about Mother's need for a Rule 17 guardian *ad litem* and (2) the evidence did not support termination of parental rights under N.C. Gen. Stat. § 7B-1111(a)(1), (2) or (7).    We disagree.

### A. Guardian *ad litem*

First, Mother contends the trial court erred in failing to conduct an inquiry about her need for a guardian *ad litem*.

> A trial court's decision concerning whether to appoint a parental guardian *ad litem* based on the parent's incompetence is reviewed on appeal for abuse of discretion. A trial court's decision concerning whether to conduct an inquiry into a parent's competency is also discretionary in nature.  For that reason, trial court decisions concerning both the appointment of a guardian *ad litem* and the extent to which an inquiry concerning a parent's competence should be conducted are reviewed on appeal using an abuse of discretion standard.  An [a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.

*In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015) (cleaned up).

N.C. Gen. Stat. § 7B-602 states, "[o]n motion of any party or on the court's own motion, the court may appoint a guardian ad litem for a parent who is incompetent in accordance with G.S. 1A-1, Rule 17."  An "incompetent adult" is  defined by N.C. Gen. Stat. § 35A–1101(7) as one "who lacks sufficient capacity to manage the adult's own affairs or to make or communicate important decisions concerning the adult's

person, family, or property whether the lack of capacity is due to mental illness, mental retardation, epilepsy, cerebral palsy, autism, inebriety, senility, disease, injury, or similar cause or condition." *In re T.L.H.*, 368 N.C. at 106, 772 S.E.2d at 455 (quoting N.C. Gen. Stat. § 35A–1101(7)).

"[A] trial judge has a duty to properly inquire into the competency of a litigant in a civil trial or proceeding when circumstances are brought to the judge's attention [that] raise a substantial question as to whether the litigant is *non compos mentis.*" *Id.* (quoting *In re J.A.A.,* 175 N.C. App. 66, 72, 623 S.E.2d 45, 49 (2005)).

In the case *sub judice*, although Mother had previously been appointed a guardian *ad litem* in the underlying case years prior, neither party raised any question as to whether Mother was currently *non compos mentis* or in need of a guardian *ad litem*. Additionally, the trial judge heard Mother's live testimony including: Mother holds a full-time job as a billing agent who helps people with their insurance making $2400.00 a month; she rents an apartment for which she pays $1350.00 per month; and she receives no assistance from anyone else. Mother's own testimony provided clear evidence of her "managing her own affairs" and "communicating" about the decisions she is making. N.C. Gen. Stat. § 35A–1101(7). Additionally, our Supreme Court has made clear that substantial deference is necessary when the trial judge "actually interacts with the litigant whose competence is alleged to be in question and has, for that reason, a much better basis for assessing the litigant's mental condition" than an appeals court which is "limited to reviewing

a cold, written record." *In re T.L.H.*, 368 N.C. at 108, 772 S.E.2d at 456. Therefore, we cannot now say that the trial court abused its discretion by not conducting further inquiry on its own motion as to whether Mother was incompetent.

**B. Termination**

Next, Mother contends the evidence does not support the termination of her parental rights. First, she challenges parts of findings of fact 16-22 and 24, then asserts the remaining findings do not support the conclusion that grounds exist to terminate her parental rights. We address each in turn.

**1. Findings of Fact**

We have consistently held "[u]nsupported findings or portions of findings are disregarded, and we review only the proper findings when determining whether the findings of fact support the conclusions of law. Findings of fact supported by clear and convincing evidence are 'deemed conclusive even if the record contains evidence that would support a contrary finding.'" *In re J.N.J.*, 286 N.C. App. 599, 605, 881 S.E.2d 890, 896 (2022) (internal citation omitted) (quoting *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019)).

Finding of fact 16 states, "[a]s a result of adjudication, the Court entered the following dispositional orders with regard to the Mother in order to alleviate the behaviors and conditions which led to the removal of the child." The finding of fact lists eight items:

> a. Complete a comprehensive parental capacity assessment

(with collateral contacts including this Court's orders) and comply with any recommendations;

b. Follow all recommendations of all mental health assessments or evaluations;

c. Maintain contact and cooperate with assigned foster care social worker and GAL and participate in ongoing case management;

d. Maintain stable, clean and safe housing;

e. Complete a substance abuse assessment and follow recommendations to include random drug tests;

f. Complete comprehensive domestic violence counseling and follow recommendations;

g. Complete an anger management counseling program and follow all recommendations;

h. Maintain stable source of income.

However, the record shows the trial court did not enter a dispositional order. While the record tends to indicate a dispositional hearing was scheduled for 11 October 2023, the record on review is devoid of any evidence of the hearing having been held. On 8 December 2023, the trial court entered an order for continuance. On 19 March 2024, the trial court granted two more continuances. The second and third orders for continuance note that a disposition order following the adjudication had not been filed and Mother could not be located. Another hearing was scheduled for 12 April 2024. However, at the 12 April 2024 hearing a permanency planning order was entered, not a disposition order. The permanency planning order was not entered into evidence and no testimony about it was presented at the TPR hearing. Therefore, the only

evidence or testimony regarding the trial court's orders for Mother to correct the conditions of removal was provided by the social worker:

> Q. And at that time, the Court ordered the respondent mother to participate in some services?
>
> A. Correct, yes.
>
> Q. Do you recall what those services were?
>
> A. If I'm not mistaken, mental health services and I think a PCE. As well as, you know, it was requested that she have in person hearings.

At best, this testimony is the only evidentiary support for sections a and b of finding 16. No evidence or testimony supports the contention that the trial court ever ordered the items listed in subsections c-h. Therefore, we disregard subsections c-h of finding of fact 16.

Finding of fact 17 states,

> The Respondent Mother has willfully failed to make reasonable progress under the circumstances has been made in correcting those conditions [sic] which led to the removal of the juvenile as follows:
>
> a. Respondent mother failed to engage in mental health treatment.
>
> b. Respondent Mother has failed to cooperate with case management and with the social worker in that she goes for long periods of time refusing to speak with the social worker or other allied professionals on the case in order to complete services or to visit with the juveniles
>
> c. Respondent mother failed to engage in anger management.

While the intent of the finding is evident, the language is nonsensical. More significantly, because there is no record of a mental health evaluation having occurred, there is no evidence that Mother was in need of mental health treatment. Additionally, there is no evidence the trial court ever ordered Mother to complete anger management classes. In contrast, there is substantial evidence Mother failed to cooperate with case management. The social worker testified Mother had not participated in any hearings or responded to any of his communications since Robby's initial adjudication in May of 2023 until the current TPR hearing. Therefore, we disregard section a and c of finding 17, but section b of finding 17 is supported by competent evidence.

Finding of fact 18 states, "[Mother] has not responded to any letters or phone contacts from DSS. DSS has been unable to assess the home of [Mother] or speak of the next steps within her case regarding reunification with her son." There is direct testimony from the DSS social worker supporting this finding. He stated all letters had been returned to sender, he no longer had a good phone number, and he did not "have any information about the safety of the respondent mother's current home." Finding of fact 18 is supported by clear and convincing evidence and deemed conclusive on appeal. *In re J.N.J.*, 286 N.C. App. at 605, 881 S.E.2d at 896.

Finding of fact 19 states,

> [Mother] has blocked her DSS social worker from contacting her phone and mail has been returned as return

> to sender. DSS also made attempts to locate the Mother via social media searches and YouTube activity, which were unsuccessful. DSS has not had any physical contact with [Mother] and has only spoken to her via text message which stopped in the Month of May/June 2023.

This finding is consistent with and supported by the DSS social worker's testimony. While he did not specify Mother had "blocked" her phone, he did testify that the number would no longer reach Mother. Additionally, he testified that letters were returned as return to sender, attempts to locate her via social media and YouTube were unsuccessful, and the last time he heard from her via text message was May of 2023. Therefore, this finding is supported by competent evidence and deemed conclusive on appeal.

Finding of fact 20 states,

> [v]isitation was offered to the Mother but she failed to have a single visit with the child since he came into DSS care. The Department initially reached out to scheduled visits with [Mother] at the initiation of the case. DSS reached out to confirm the set days and time on February 3, 2023. Ms. Smith never initiated visitation with [Robby] and to date has not had a visit with the children [sic] since he came into DSS care. [Mother] has not made any other efforts to speak with DSS about seeing [Robby] or making efforts to see him virtually since February of 2023.

Mother contends there is no evidence that she refused visitation or made no effort to maintain contact with or visit Robby. We disagree. Mother testified that she left North Carolina after her last in person court date and never returned to the state. She also testified she had had no contact with Robby or DSS since that time. The

exact date Mother thought her last "in person" court date had occurred is unclear; however, the record tends to show she did not attend any hearing in person after 24 January 2023. Additionally, the DSS social worker testified that he has been Robby's social worker since 11 January 2023 but had never met Mother in person. Further, he testified she had not participated in any activities or availed herself of any services to work toward reunification. Thus, finding of fact 20 is supported by clear and convincing evidence and deemed conclusive on appeal.

Mother contends the portions of finding of fact 21 which state Mother "has not provided cards, gifts or letters for the child," has provided "no explanation as to why she had not participated in services, and has had no contact with her child" are unsupported. We disagree.

Mother testified she sent money with her cousin because they were supposed to meet with her other children at DSS and it was for "all of them." However, she also stated she had made no effort to contact DSS regarding any money being sent and the social worker testified that he was unaware of Mother having made any financial contribution toward Robby's care. It is the trial court's duty to determine "the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom." *In re K.W.*, 282 N.C. App. 283, 290, 871 S.E.2d 146, 152 (2022) (quoting *Phelps v. Phelps,* 337 N.C. 344, 357, 446 S.E.2d 17, 25 (1994)). The trial court's finding that Mother had provided no financial support for Robby is supported by the social worker's testimony, which the trial court

determined to be more credible than Mother's.

When asked why she had not participated in services through DSS or contacted Robby, Mother stated she had been focused on trying to get money for a lawyer to help her win her case. However, she never gave any reason for why she moved to Florida rather than remaining in North Carolina where Robby and DSS were located or why she could not raise money and participate in services simultaneously. When asked why she relocated, Mother responded that she "left to start fresh." The trial court's finding that Mother had no explanation as to why she was not participating in services or contacting Robby is supported by clear and convincing evidence.

Finding of fact 22 relates to the termination of Mother's parental rights to her older children:

> [Mother] has had her parental rights previously terminated for children in file numbers 11 JA 111-112 and 17 JA 91-92 based on lack of completion of services to address substance abuse, domestic violence, and mental health issues. There is no evidence the Mother has addressed any of the concerns that lead to her previous termination.

At the hearing, DSS requested that the trial court take judicial notice of the termination of parental rights orders concerning Mother's older children. The trial court responded that it would "take notice that it occurred" but "will not take judicial notice of the order[s]." Mother testified that her parental rights were terminated because the trial court "did not receive all the services that [she] completed" but was

insistent she had done the work requested. There was no testimony or evidence presented to support the portion of the finding stating that Mother failed to complete services for substance abuse, domestic violence and mental health. Therefore, we affirm the portion of finding of fact 22 stating "[Mother] has had her parental rights previously terminated for children in file numbers 11 JA 111-112 and 17 JA 91-92 " only and disregard the portions of finding 22 that follow.

Finally, finding of fact 24 makes findings as to how Mother failed to make reasonable progress on the conditions which led to removal. Finding of fact 24 states,

> The Respondent Mother willfully failed to make reasonable progress under the circumstances has been made in [sic] correcting those conditions which led to the removal of the juvenile as follows:
>
> a. Respondent mother failed to engage in mental health services with B & D Behavioral Health Services.
>
> b. Respondent mother failed to participate in Outpatient therapy and medication management.
>
> c. Respondent Mother has failed to cooperate with case management and with the social worker in that she refused to speak with the social worker or other allied professionals on the case in order to complete services or to visit with the juveniles [sic].
>
> d. Respondent mother failed to engage in anger management.

As noted *supra,* finding of fact 17 contains similar language concerning Mother's failure to make reasonable progress for failure to complete activities the trial court did not order. There is no evidence in the record Mother was ever ordered to have or

did have a mental health evaluation from which the trial court could have ordered she engage with mental health services. Similarly, there is no evidence in the record Mother had been ordered to engage in therapy, medication management, or anger management. The only part of finding of fact 24 supported by evidentiary testimony is subsection c, "Mother failed to cooperate with case management." This finding was supported by testimony given by Mother and the social worker that she left the state and did not engage with DSS or Robby thereafter. Subsection c of finding of fact 24 is supported by clear and convincing evidence and deemed conclusive on appeal. Subsections a, b, and d of finding of fact 24 are disregarded.

The numerous findings of facts referencing hearings which from review of the record appeared to have never been conducted and referencing orders that were not entered, as well as evaluations and services the trial court never ordered, lead us to conclude that portions of the order on appeal may have been copied and pasted from a TPR order in a case wholly unrelated to the case *sub judice*. We encourage careful attention to detail in future orders and must disregard all above noted erroneous findings as we review the termination. *In re J.N.J.*, 286 N.C. App. at 605, 881 S.E.2d at 896.

## 2. Grounds for Termination

Mother argues that after we disregard unsupported findings of fact, the remaining findings are insufficient to support the termination of her parental rights on any grounds. Additionally, Mother brings our attention to significant

discrepancies between the grounds DSS alleged in its TPR petition and those found by the trial court. For example, DSS did not explicitly allege abandonment as a ground for termination in its TPR petition. For the trial court to find abandonment as a basis for termination, the factual allegations included in the petition must have placed Mother "on notice as to what acts, omissions or conditions are at issue." *In re D.R.J.*, 381 N.C. 381, 387, 873 S.E.2d 281, 286 (2022) (quoting *In re B.C.B.*, 374 N.C. 32, 34, 839 S.E.2d 748, 751 (2020)). Mother contends the factual allegations as to abandonment did not meet this burden. However, we need not address a challenged basis where alternative grounds support the termination of parental rights. After all, it is well established that "a finding of only one ground is necessary to support a termination of parental rights." *In re A.R.A.*, 373 N.C. 190, 194, 835 S.E.2d 417, 421 (2019).

Pursuant to N.C. Gen. Stat. § 7B-1111(a)(2), parental rights may be terminated if the parent "has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C. Gen. Stat. § 7B-1111(a)(2).

Mother contends that because she did not engage in a case plan with DSS there is limited evidence of what the requirements were for her to work towards

reunification and that the lack of evidence makes it "impossible for the trial court to analyze the elements of this ground." We disagree.

Our Supreme Court has made clear, "compliance or noncompliance with a case plan is not, in and of itself, determinative of a parent's reasonable progress in correcting the conditions that led to a child's removal from the home." *In re B.J.H.*, 378 N.C. 524, 554, 862 S.E.2d 784, 805 (2021). A parent's refusal to sign a case plan "does not preclude a trial court's assessment of [her] 'progress . . . in correcting those conditions which led to the removal of the [child].'" *Id.* (quoting N.C. Gen. Stat. § 7B-1111(a)(2)). Thus, the trial court looks to the adjudication of the petition on abuse, neglect, and dependency to determine the conditions that led to removal and evaluates the evidence presented regarding the parent's ability to correct those conditions.

Robby was removed from Mother's care for reasons of abuse, neglect, and dependency. The abuse adjudication stemmed from the black eye and scratches noted by Robby's daycare and substantiated by CANMAC for which Mother had no explanation. The neglect adjudication stemmed from Mother's failure to seek medical care for Robby even when prompted by DSS and medical professionals and the ongoing domestic violence between Mother and her husband. Lastly, the dependency adjudication stemmed from Mother's lack of appropriate alternative childcare arrangements once she was unable to provide for Robby's proper care.

Evidence from the termination hearing consistently demonstrated Mother did nothing to improve the conditions which had led to Robby's removal. Mother refused to engage with DSS, moved out of state without providing any contact information to DSS, and did not engage in any evaluation or services to address the reasons for removal including domestic violence or child abuse. Mother testified she had previously worked with DSS during the case for her older children so she was aware of the services DSS could offer her to address the reasons for Robby's removal and to aid in reunification; however, she "left to start fresh" and cutoff communication with DSS. At the time of the termination hearing Robby had been in care for just over two years. Mother's own testimony in addition to that of the DSS social worker provides clear and convincing evidence Mother did nothing to correct the removal conditions and supports the trial court's determination that grounds exist to terminate Mother's parental rights under N.C. Gen. Stat. § 7B-1111(a)(2).

### III. Conclusion

For the foregoing reasons, we affirm the trial court's determination that grounds exist under N.C. Gen. Stat. § 7B-1111(a)(2) to terminate Mother's parental rights. Additionally, the trial court did not abuse its discretion when it did not conduct an inquiry about Mother's need for a guardian *ad litem* as the issue was not raised by the parties and the trial court made a reasoned decision that Mother's testimony demonstrated she had the capacity to manage her own affairs and communicate her decisions.

AFFIRMED.

Judges CARPENTER and STADING concur.

Report per Rule 30(e).